FILED
CLERK, U.S. DISTRICT COURT
12/13/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: VM DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2:21-CR-00572-FMO |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1001(a)(2): False Statements] |
| DAVID F. ALEXANDER, | |
| Defendant. | |

The United States Attorney charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

A. RELEVANT PERSONS AND ENTITIES

1. The Los Angeles Department of Water and Power ("LADWP") was the largest municipal utility in the United States, and provided water and electricity services to approximately 4 million residents in and around the City of Los Angeles (the "City"). LADWP was governed by a five-member Board of Commissioners (the "LADWP Board"). LADWP was a City agency that received more than $10,000 per year in funds from the United States, including for the years 2017 through 2019, in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

2.  Defendant DAVID F. ALEXANDER was the Chief Information Security Officer of LADWP from on or about May 29, 2017, until on or about February 25, 2019.  From on or about February 25, 2019, until on or about August 12, 2019, defendant ALEXANDER was the Chief Cyber Risk Officer of LADWP.  In both capacities, defendant ALEXANDER reported directly to the Chief Administrative Officer of LADWP, who reported directly to the LADWP General Manager.

3.  The Southern California Public Power Authority ("SCPPA") was a collective group of eleven municipal utilities that included LADWP.  At the request of a member utility, SCPPA had the ability to facilitate joint service contracts.

B.  THE GRAND JURY INVESTIGATION

4.  Beginning in March 2019, the United States Attorney's Office ("USAO") and the Federal Bureau of Investigation ("FBI"), via a federal Grand Jury, were conducting an investigation to determine whether criminal violations had been committed related to, among other things, collusive litigation involving the Los Angeles City Attorney's Office stemming from LADWP's failed billing system (the "Grand Jury investigation").  This investigation sought to identify the persons who had committed, caused, and conspired to commit federal criminal violations.

C.  THE BRIBERY SCHEME

   **1.  Background**

5.  Starting around 2017, defendant ALEXANDER developed a professional relationship with Paul O. Paradis, a New York lawyer who, among other things, represented LADWP as Special Counsel in an affirmative lawsuit alleging that PricewaterhouseCoopers ("PwC") — the vendor of LADWP's billing system — was to blame for LADWP's

2

misbilling of hundreds of thousands of ratepayers.  In 2017, Paradis created a company known as Aventador Utility Solutions, LLC ("Aventador"), which obtained a three-year, $30,000,000 no-bid contract with LADWP to perform remediation work on the faulty billing system.  Aventador also performed certain cybersecurity-related work for LADWP.

6.   In or around March 2019, Paradis resigned as Special Counsel for LADWP in the PwC lawsuit.  Later that month, Paradis purportedly sold Aventador to an employee, and Aventador officially changed its name to Ardent Cyber Solutions, LLC ("Ardent").  Paradis represented to LADWP and the City of Los Angeles (the "City") that he had no financial interest in, or control over, Aventador and its successor, Ardent.

**2.   Defendant ALEXANDER Manipulates Two Bidding Processes to Help Secure LADWP Contracts for Paradis's Aventador/Ardent**

(a)   The SCPPA Request for Proposal Process

7.   On February 8, 2019, SCPPA issued a Request for Proposal ("RFP") for a cybersecurity services contract (the "SCPPA RFP") at the request of LADWP's then-General Manager, David Wright.  Defendant ALEXANDER, who was the Vice-Chair of the SCPPA Cyber Security Working Group, was the primary drafter of the SCPPA RFP.  The SCPPA RFP solicited proposals from vendors to provide cybersecurity services in eleven defined areas.  The SCPPA RFP contemplated that multiple vendors would be awarded a cybersecurity services contract with SCPPA under a master agreement, under which individual member utilities, like LADWP, could independently engage a vendor's services.

8.   Defendant ALEXANDER was one of four members of the scoring committee for the SCPPA RFP, which was responsible for conducting a

preliminary review and assessment of the proposals submitted in response to the SCPPA RFP and then presenting its scores and recommendations to the SCPPA Cybersecurity Working Group.

9. Defendant ALEXANDER knew and understood that the SCPPA RFP process was intended to be a competitive, neutral, and transparent process in order to ensure the integrity of the cybersecurity bench. Defendant ALEXANDER, however, manipulated the SCPPA RFP process with the goal of securing future cybersecurity work for Aventador. After Aventador became Ardent, defendant ALEXANDER sought to secure future work for Ardent. Defendant ALEXANDER should have known, and knew no later than July 16, 2019, that Paradis was supposed to have no role in or involvement with Aventador or Ardent. Nonetheless, defendant ALEXANDER knew and understood that Paradis was actually serving as the principal of Ardent, including by pursuing the cybersecurity services contract for Ardent through the SCPPA RFP.

10. Between late February 2019 and April 2019, defendant ALEXANDER used his position and influence as the LADWP Chief Cyber Risk Officer and the Vice-Chair of the SCPPA Cyber Security Working Group to manipulate the SCPPA RFP process by influencing the composition of the scoring committee to include individuals whom he could persuade to rank Ardent favorably and sharing his scores for the SCPPA proposals with other members of the committee in an effort to persuade them to score Ardent favorably.

11. On April 5, 2019, the SCPPA Cybersecurity Working Group informed Ardent that it would recommend Ardent for the SCPPA contract.

12. On April 5, 2019, defendant ALEXANDER met with Paradis at a restaurant in Los Angeles. During this meeting and in all subsequent

interactions with defendant ALEXANDER referenced herein, Paradis was acting at the direction of the FBI.  During this meeting, defendant ALEXANDER told Paradis that he had used the SCPPA bidding process to get LADWP's "desired outcome," that is, a contract with Ardent, but in a manner that falsely appeared "completely transparent." Defendant ALEXANDER boasted that he was the one who had secured the contract for Ardent, informing Paradis, "that was me driving it."

13.  On April 18, 2019, the SCPPA Board approved a multi-award contract for Ardent and two other vendors valued at a total of approximately $17,000,000.

14.  Shortly after SCPPA awarded the contracts, the City instructed LADWP to re-bid the contracts through the standard LADWP procurement process (the "LADWP RFP"), instead of through SCPPA, to ensure an extra layer of transparency and maximum competition.  In the interim, the LADWP Board of Commissioners approved short-term "bridge" contracts for Ardent and the other two vendors.

(b)   The LADWP RFP Process

15.  On June 17, 2019, LADWP issued the LADWP RFP for the award of a three-year, $82.5 million Cybersecurity Consulting Services contract, with a submission deadline of July 10, 2019.  Defendant ALEXANDER knew and understood that state and local laws and regulations required the LADWP RFP process to be a fully competitive, neutral, and transparent process in order to ensure fair competition amongst the vendors and to ensure that LADWP acquired the services of a qualified vendor that satisfied its requisite criteria.

16.  Defendant ALEXANDER was one of seven members of the evaluation committee that was responsible for reviewing the proposals submitted in response to the LADWP RFP.  All evaluators, including

5

defendant ALEXANDER, signed a sworn nondisclosure agreement that they would not discuss their scoring on the proposals with anyone.

17. In late May 2019, before the LADWP RFP was issued, defendant ALEXANDER began his efforts to also manipulate the LADWP RFP process to favor Ardent. Defendant ALEXANDER was one of the drafters of the anticipated LADWP RFP, and he shared drafts of the LADWP RFP with Paradis and solicited Paradis's edits. By these actions, defendant ALEXANDER intended to craft and crafted the LADWP RFP to correspond with Ardent's specific strengths and to improve Ardent's odds of being awarded the contract.

18. After the LADWP RFP was issued, between in or around June and July 2019, defendant ALEXANDER worked closely with Paradis to help him improve Ardent's proposal for submission, including by reviewing and editing drafts of Ardent's proposal.

19. On July 10, 2019, Paradis caused Ardent to submit its proposal to the LADWP RFP. In total, over a dozen vendors submitted proposals for the LADWP RFP.

20. Defendant ALEXANDER also undertook efforts to influence the other members of the evaluation committee to rate Ardent favorably, notwithstanding the sworn nondisclosure agreement. For example, on July 9, 2019, the day before the submission deadline for proposals for the LADWP RFP, defendant ALEXANDER told Paradis, via text message, that he would "handle" another individual on the evaluation committee because he believed that he and the other individual could work well together "toward our desired goals." In response, Paradis asked if defendant ALEXANDER was confident that the individual would "cooperate with you and rank Ardent with a very high overall score." Defendant ALEXANDER responded, "Very...."

6

21. On July 9, 2019, Paradis told defendant ALEXANDER, via text message, that after he submitted the Ardent proposal, "it will be up to you to 'manage' the evaluators the same way you did for the SCPAA [sic] process so that we get the correct result... 😉 [winking face emoji]." Defendant ALEXANDER responded via text message, "I know my job 😂 [crying-laughing emoji]."

22. On July 12, 2019, defendant ALEXANDER told Paradis, via text message, about the required sworn nondisclosure agreement. Defendant ALEXANDER remarked that this requirement "seriously limits me," which was a reference to his planned efforts to influence the other evaluators to rate Ardent favorably. Paradis responded that he was not concerned about defendant ALEXANDER being "limited" because, as defendant ALEXANDER had told Paradis earlier, defendant ALEXANDER "know[s] his job."

23. On July 15, 2019, defendant ALEXANDER, via text message, advised Paradis that he had provided two of the evaluators with "'cliff notes' on my proposal thoughts."

### 3. Defendant ALEXANDER Seeks Employment at Ardent from Paradis, and Paradis Represents That Ardent Will Hire Him

24. On July 16, 2019, defendant ALEXANDER met with Paradis for lunch at a restaurant in Los Angeles. During this meeting, defendant ALEXANDER again told Paradis that he and the other evaluators for the LADWP RFP had been required to sign an agreement attesting that they would not speak to each another about their scores for the LADWP RFP responses. Defendant ALEXANDER explained that, notwithstanding this signed agreement, he had provided his score sheet to two other evaluators in order to influence them to give Ardent a high score. Defendant ALEXANDER stated that he was working to speak with other

7

evaluators for the same purpose.  Paradis thanked defendant ALEXANDER for his help securing the LADWP RFP for Ardent.

25.  During this same lunch meeting, Paradis asked defendant ALEXANDER what his future employment plans were.  Defendant ALEXANDER responded that he was considering multiple options outside of LADWP and informed Paradis that he was interested in working at Ardent as its business manager.  Defendant ALEXANDER and Paradis discussed this proposed job, including the general scope of job responsibilities for defendant ALEXANDER, the future location and growth of Ardent, and Ardent's "platinum-level" health insurance benefits.  Defendant ALEXANDER and Paradis also discussed a prospective start date of September 1, 2019.  At Paradis's suggestion, defendant ALEXANDER agreed to create a written job description of defendant ALEXANDER's intended role at Ardent, along with his terms and conditions for the job.  Defendant ALEXANDER told Paradis that he needed to confirm the terms of his retirement package from LADWP, since he was considering leaving two years before reaching the retirement age.

26.  Near the end of the lunch meeting, defendant ALEXANDER told Paradis that he would make sure that the LADWP RFP evaluation for Ardent "stays in order," meaning that he would continue his efforts to improperly influence the LADWP RFP process in Ardent's favor. Defendant ALEXANDER told Paradis that he would need to remain at LADWP at least until he had secured the LADWP contract for Ardent. Accordingly, defendant ALEXANDER told Paradis that he could not start on September 1, 2019, and that he would need to stay at LADWP until at least October 2019.

27.  After the lunch meeting, defendant ALEXANDER, via text message, asked Paradis who Ardent employed as its Chief Financial

Officer.  Paradis responded that it was someone he had known for over 12 years and inquired why defendant ALEXANDER was asking.  Defendant ALEXANDER replied that he was "scoping" his role and responsibilities "for my new job."  Paradis responded via text message that defendant ALEXANDER's job duties "will be what we discussed, namely operations and business management."  Defendant ALEXANDER stated, "So I am thinking essentially a Chief Administrative Officer," to which Paradis replied, "I agree completely."

    **4.**  **Defendant ALEXANDER Guarantees Future Task Orders for Ardent in Return for Additional Compensation from Paradis**

   28. On July 17, 2019, defendant ALEXANDER, via text message, told Paradis that he had "[j]ust finished my conversation with the retirement group.  Not good at all.  We need to talk to discuss options, when you have a chance."

   29. Later that same day, defendant ALEXANDER and Paradis met at a coffee shop in Los Angeles.  During the meeting, defendant ALEXANDER and Paradis discussed the following:

    a. Defendant ALEXANDER relayed to Paradis that he had learned from an LADWP retirement analyst that if he retired before the age of 55, he would lose what amounted to $60,000 a year "for 30 years" or "for the rest of [his] life."  During his conversation with Paradis, defendant ALEXANDER repeatedly referred to the retirement penalty as a loss of $60,000 a year over 30 years, or "for the rest of [his] life."

    b. Paradis responded that the retirement penalty was "easily handled," but that if Paradis was going to "guarantee" additional compensation to make up for defendant ALEXANDER's loss in LADWP retirement income, defendant ALEXANDER would also need to

9

"guarantee certain things."  In exchange for the additional compensation, defendant ALEXANDER told Paradis that while he remained at LADWP, he could provide certain guarantees to Paradis and Ardent in the form of future task orders from LADWP that assigned specific work for which Ardent could be compensated.

   c. Specifically, as the Chief Cyber Risk Officer at LADWP, defendant ALEXANDER communicated to Paradis that he could procure task orders for cybersecurity work under the anticipated LADWP contract.  Defendant ALEXANDER calculated for Paradis the amount of money defendant ALEXANDER could allocate in a task order to Ardent.  Defendant ALEXANDER stated that he could also guarantee Ardent task orders for cybersecurity training.

   d. Defendant ALEXANDER told Paradis that he could "guarantee" Ardent a total of $10,500,000 to $11,500,000 in task orders in two specified sectors.  Additionally, defendant ALEXANDER stated that he could help to push work towards Ardent in a third sector, namely remediation.

   e. Defendant ALEXANDER and Paradis discussed the need for defendant ALEXANDER to stay on longer at LADWP to deliver on these guarantees.  In exchange for defendant ALEXANDER's agreement to stay at LADWP to secure the promised task orders to Ardent, Paradis offered to pay a bonus for the period of time defendant ALEXANDER stayed on at LADWP "from our deal on."  Defendant ALEXANDER agreed and commented that the payment amounted to a "signing bonus."

   f. Near the end of their meeting, defendant ALEXANDER confided that he would tell no one about his corrupt arrangement with Paradis, stating that "[a]s far as what I do and when I can execute against that contract is between you, me, and the wall."  Defendant

10

1  ALEXANDER added that "[his] wife is not even going to know.  She has
2  to be able to attest."

3     30.  By his actions, defendant ALEXANDER solicited and agreed to
4  accept from Paradis a future job as the Chief Administrative Officer
5  of Ardent, a to-be-determined executive-level annual salary, a sign-
6  on bonus, and recompense for his early retirement penalty from LADWP.
7  Defendant ALEXANDER did so intending to be influenced and rewarded in
8  connection with his ongoing assistance in securing the award of a
9  multi-million dollar LADWP contract to Ardent and use of his position
10 to guarantee over $10,000,000 in future task orders for Ardent under
11 the anticipated LADWP contract.

     **5.  Defendant ALEXANDER Asks for a Secret Ardent E-Mail Address and Laptop to Communicate with Paradis and to Secretly Perform Work for Ardent**

14     31.  Following his meeting with Paradis on July 17, 2019, and consistent with their illegal arrangement, defendant ALEXANDER continued his efforts to manipulate the LADWP RFP process in Ardent's favor.

18     32.  Defendant ALEXANDER also began advising Paradis more broadly about business plans for Ardent, consistent with their secret agreement for defendant ALEXANDER to be the Chief Administrative Officer for Ardent.  For example, on July 18, 2019, defendant ALEXANDER told Paradis via text message that, "we need to build some artwork and [collateral] for our RFPs, going forward."  On that same day, defendant ALEXANDER provided Paradis with information about another SCPPA RFP in which Paradis had indicated an interest in applying for Ardent and advised Paradis that it was such a small amount that it was not worth it "for us to even fucking bother."

28     33.  During a phone call on July 18, 2019, defendant ALEXANDER

11

asked Paradis for a secret e-mail account with Ardent that did not have his name on it.  Paradis responded that he could provide the requested e-mail address, as well as a laptop, for defendant ALEXANDER's use.  Defendant ALEXANDER agreed that an Ardent-issued laptop would be helpful so that he could "do all that work with no evidence anywhere else" and because "if anything happens, I just give you the laptop back and it's lock, stock, and barrel, and I don't have anything anywhere else."  Paradis agreed to drop off the laptop for defendant ALEXANDER the following day.

34. On July 19, 2019, defendant ALEXANDER, via text message, asked Paradis if he was still planning to deliver the Ardent-issued laptop that day.  On a phone call that same day, defendant ALEXANDER and Paradis agreed on a secret e-mail address of "FrancesW@ardent.com."

**6.   Defendant ALEXANDER's Lies to the FBI**

35. On July 22, 2019, the FBI executed search warrants at LADWP as part of its ongoing investigation into LADWP and the City Attorney's Office.

36. On July 24, 2019, defendant ALEXANDER participated in a voluntary interview with the FBI regarding the Grand Jury Investigation during which he lied about his conversations and agreements with Paradis.

37. On July 26, 2019, defendant ALEXANDER participated in another voluntary interview with the FBI.  During that interview, defendant ALEXANDER falsely stated that he had declined any employment opportunity with Ardent and that he had never provided any guarantees to Ardent or to Paradis.

38. These Introductory Allegations are incorporated into the sole count of this Information.

COUNT ONE

[18 U.S.C. § 1001(a)(2)]

39. On or about July 24, 2019, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI, defendant DAVID F. ALEXANDER knowingly and willfully made materially false statements and representations to the FBI, knowing that these statements and representations were untrue. Specifically, defendant ALEXANDER falsely stated: (a) that he had declined any future employment opportunity with Ardent and (b) that he had not expected any compensation from Paul O. Paradis. In fact, as defendant ALEXANDER then knew, defendant ALEXANDER had solicited and agreed to accept from Paradis a future job as the Chief Administrative Officer of Ardent, an executive-level annual salary, and an additional annual payment of $60,000, and defendant ALEXANDER

///
///
///

expected these benefits as compensation, including for his assistance in securing LADWP's award of the Cybersecurity Consulting Services contract and future task orders for Ardent.

TRACY L. WILKISON
United States Attorney

*[signature]*

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption
and Civil Rights Section

MELISSA MILLS
J. JAMARI BUXTON
SUSAN S. HAR
Assistant United States Attorneys
Public Corruption and Civil
Rights Section