TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal. Bar No. 342364)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-3289
    Facsimile:    (213) 894-0141
    E-mail:    Susan.Har@usdoj.gov
        Jamari.Buxton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-572-SB |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM; DECLARATION OF ANDREW R. CIVETTI; EXHIBITS 1-15 |
| v. | |
| DAVID F. ALEXANDER, | Hearing Date:  June 7, 2022 |
| Defendant. | Hearing Time:  8:00 a.m. |
| | Location:  Courtroom of the Hon. Stanley Blumenfeld |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Susan S. Har and J. Jamari Buxton, hereby files its sentencing memorandum.

This sentencing memorandum is based upon the attached memorandum of points and authorities, the supporting declaration and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 24, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_/s/_____
SUSAN S. HAR
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                                      <u>PAGE</u>

I.      INTRODUCTION ...................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................ 2

      A.     Defendant Manipulates the SCPPA Contract Bidding Process ................... 3

      B.     Defendant Manipulates the LADWP Contract Bidding Process ................. 4

      C.     Defendant Solicits an Executive Role at Ardent ............................................ 5

      D.     Defendant Guarantees Paradis Millions of Dollars in Task Orders for Additional Compensation ........................................................................ 7

      E.     Defendant Continues His Corrupt Arrangement to Be Ardent's CAO ........ 8

      F.     Defendant Seeks to Obstruct the Federal Investigation ............................... 9

III.    PROCEDURAL HISTORY ...................................................................... 11

IV.     THE GUIDELINES RANGE .................................................................... 12

V.      THE GOVERNMENT'S SENTENCING RECOMMENDATION ..................... 14

      A.     The Nature and Circumstances of Defendant's Offenses .......................... 14

      B.     Victim Impact ................................................................................ 16

      C.     General and Specific Deterrence ................................................................ 17

      D.     Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense .............................. 19

      E.     History and Characteristics of Defendant ................................................... 19

      F.     Avoidance of Sentencing Disparities ......................................................... 21

      G.     Fine ................................................................................ 23

VI.     CONCLUSION ................................................................................ 23

1

# TABLE OF AUTHORITIES

DESCRIPTION                                                                 PAGE

Cases

United States v. Bistline,
  665 F.3d 758 (6th Cir. 2012) ...................................................................21
United States v. Martin,
  455 F.3d 1227 (11th Cir. 2006) .............................................................17
United States v. Morgan,
  635 F. App'x 423 (10th Cir. 2015) .........................................................19
United States v. Mueffelman,
  470 F.3d 33 (1st Cir. 2006) ...................................................................18
United States v. Musgrave,
  761 F.3d 602 (6th Cir. 2014) ..........................................................18, 21
United States v. Prosperi,
  686 F.3d 32 (1st Cir. 2012) ...................................................................21
United States v. Spano,
  411 F. Supp. 2d 923 (N.D. Ill. 2006).....................................................17
United States v. Stefonek,
  179 F.3d 1030 (7th Cir. 1999) ...............................................................18
United States v. Treadwell,
  593 F.3d 990 (9th Cir. 2010) .................................................................18

Statutes

18 U.S.C. § 666.............................................................................11, 14
18 U.S.C. § 1001(a)(2)...............................................................passim
18 U.S.C. § 3553(a) .................................................................22, 23
18 U.S.C. § 3553(a)(6)...................................................................21
28 U.S.C. § 994(d) .........................................................................21

Rules

U.S.S.G. § 2B1.1(b)(1)(G) ...........................................................12
U.S.S.G. § 2C1.1 ...........................................................................12
U.S.S.G. § 2C1.1(a)(1)...................................................................12
U.S.S.G. § 2C1.1(b)(3) ..................................................................12
U.S.S.G. § 3C1.1 ...........................................................................13
U.S.S.G. §§ 5H1.2..........................................................................21
USSG §§ 1B1.2(a), 1B1.3(a) ........................................................12

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   INTRODUCTION

As the Chief Cyber Risk Officer of the Los Angeles Department of Water and Power ("LADWP"), defendant David Alexander held a position of public trust.  In that role, defendant was a key member of what should have been a competitive and neutral decision-making process to award a multi-million-dollar cybersecurity services contract for LADWP and other utilities in Southern California.  When defendant instead used his position to manipulate the bidding process to secretly benefit Ardent Cyber Solutions ("Ardent")—from whose principal defendant later solicited various benefits—he betrayed that trust to the detriment of LADWP, the citizens of Los Angeles, the other utilities, and the competitor vendors.

After the City of Los Angeles instructed LADWP to scrap that contract and re-bid it through the standard procurement process, defendant did not back away from his corrupt ways—rather, he escalated them.  Defendant again manipulated the re-bid process, this time on both ends: that is, he worked hand-in-hand with Ardent to craft its proposal and advise its principal, while also drafting the contract request to favor Ardent and influencing the other evaluators on the selection side.  While that process was still underway, defendant made his calculated and transactional pitch to solicit a job as Ardent's future Chief Administrative Officer.  In exchange for the Ardent job, defendant would continue to use his position and influence at LADWP to (again) steer the lucrative $82,500,000 contract to Ardent.

Defendant did not hesitate to sell out the public trust once more for his personal enrichment when he hit another obstacle.  Retiring early from LADWP to go work at Ardent meant defendant would lose out on $1,800,000 over the life of his taxpayer-funded pension.  Defendant solved this problem by striking yet another corrupt deal.  Specifically, defendant guaranteed that he would get LADWP to assign—and ultimately pay—$10,500,000 to $11,500,000 in task orders for Ardent if Ardent compensated him for the pension penalty and paid him a sign-on bonus.

Defendant was all in, and he wasted no time assuming his _de facto_ role as Ardent's executive, including by seeking out a secret laptop and email address to work on Ardent-related business despite holding a position at, and owing his loyalties to, LADWP.  Defendant's criminal plans were cut short only by law enforcement disruption—and not because of any reflection or remorse by defendant.  To the contrary, defendant repeatedly sought to obstruct justice, reassuring his purported co-conspirators that he had deleted evidence of his corrupt communications and manipulation of the bid process and by blatantly lying to the FBI in two separate interviews.

At every turn, defendant made clear through his actions and his words that his interests lay in his own financial future, which he hitched to Ardent, at the cost of LADWP and its ratepayers.  Defendant's repeated and escalating monetization of his job as a public servant, and subsequent actions to conceal his criminal activity, are highly aggravating.  The applicable Guidelines range of 70-87 months makes readily apparent both the seriousness of defendant's offenses and the very substantial benefit that the government has already afforded defendant by permitting him to resolve his case by pleading to a single false statement count with a statutory maximum of 60 months.  Upon weighing the competing considerations and other applicable sentencing factors, the government respectfully recommends the following sentence: (1) a 51-month term of imprisonment; (2) a three-year term of supervised release; (3) a $70,000 fine; and (4) a special assessment of $100.

## II.    STATEMENT OF FACTS[1]

From February to August 2019, defendant was the Chief Cyber Risk Officer of LADWP, the largest public utility in the United States.  In that role, defendant was tasked with making critical decisions on behalf of the organization to minimize cyber threats and enhance the security of critical infrastructure.  (Civetti Decl., Ex. 1.) Defendant had full access to highly confidential records and systems maintained by

---

[1] Unless indicated otherwise, all facts herein are drawn from the stipulated factual basis in defendant's plea agreement.  (_See_ Dkt. No. 6).

2

LADWP, including all personnel records for the department's thousands of employees, all customer records for its millions of customers, and to confidential systems used by LADWP to keep the power grid and the water flow operational and for the department's purchasing and procurement system. (Id.) Prior to that, defendant had been LADWP's Chief Information Security Officer since May 2017.

Starting in 2017, defendant formed a working relationship with Paul Paradis, a New York lawyer who also owned a company called Aventador Utility Solutions, LLC ("Aventador"), the predecessor to Ardent. Aventador was born out of the corrupt arrangement between Paradis and David Wright, the then-General Manager of LADWP, who rammed through the Board a $30,000,000 no-bid contract for Aventador—a lawyer-formed company with no relevant experience and sky-high rates—ostensibly to perform billing system remediation and other services (including cybersecurity-related work) for LADWP. See United States v. David H. Wright, Case No. 2:21-CR-00559-SB, Dkt. No. 7 (Plea Agreement); Dkt. No. 38 (Government's Sentencing Memorandum) at 3-6. Amidst mounting public scrutiny into Paradis in March 2019, Aventador changed its name to Ardent Cyber Solutions, LLC (Ardent), and Paradis purportedly relinquished any financial interest in or control over Aventador and Ardent. (See Civetti Decl., Ex. 2.)

## A.    Defendant Manipulates the SCPPA Contract Bidding Process

LADWP is a member of the Southern California Public Power Authority ("SCPPA"), a collective group of municipal utilities that, among other things, facilitates joint service contracts. In February 2019, SCPPA issued a Request for Proposal ("RFP") for a $17,000,000 contract to be awarded to a "bench" of chosen vendors to perform cybersecurity services for the member utilities. Over 30 vendors submitted proposals in response to the SCPPA RFP, which was intended to be a competitive, neutral, and transparent process. (Civetti Decl., Ex. 3.)

Instead of enforcing the requisite objective selection process, defendant used his inside role and influence at SCPPA to benefit Paradis' Aventador (and later, Ardent). As

the Vice-Chair of the SCPPA Cyber Security Working group, defendant drafted the SCPPA RFP and was one of the four members of the scoring committee. Defendant both influenced the composition of the scoring committee and shared his scores with the other committee members to persuade them to score Ardent favorably, before reporting back to Paradis on his efforts. In this way, defendant not only rigged the process to give Ardent a winning leg up, but he also secretly worked with Paradis, whom he knew was to have no involvement with Ardent. Defendant's efforts were successful, and by April 2019, Ardent was selected as one of three vendors for the cybersecurity bench.

Defendant later confirmed his actions to manipulate the SCPPA process during a lunch meeting with Paradis, who by that time was acting covertly at the direction of the FBI. (See Dkt. No. 1 (Information) ¶ 12.) Defendant boasted that he had flouted the SCPPA requirement of a competitive process, explaining "that was me driving it" meaning that defendant was the one who secured Ardent the contract, while still maintaining the false appearance of a "completely transparent" process.

**B.    Defendant Manipulates the LADWP Contract Bidding Process**

Shortly after Ardent was awarded the SCPPA contract, the City instructed LADWP to re-bid the cybersecurity contract through the standard LADWP procurement process, which by all accounts was a far more robust and lengthy process than the SCPPA process. Even before the LADWP RFP was issued and made public, defendant got to work in exploiting the re-bid effort and ensuring that Ardent came out on top once again.

Defendant first shared the draft of the LADWP RFP with Paradis and incorporated Paradis' edits to tailor the supposedly neutral RFP to advantage Ardent's specific strengths, thereby improving Ardent's chances straight out the gate. Next, defendant worked as an Ardent insider, advising Paradis on how to improve the proposal and providing extensive edits to the proposal itself. After Ardent submitted its proposal, along with over a dozen other vendors, defendant began working on his plan to influence the other evaluators, just as he had with the SCPPA RFP. Indeed, defendant sent Paradis

4

a text message confirming "I know my job [crying-laughing emoji]," referring to defendant's efforts to "manage" the other evaluators so that Ardent would be awarded the contract.  Even after signing a sworn nondisclosure agreement (an unusual measure that LADWP employed to ensure a fair process this time around), under which defendant was prohibited from sharing his scores with anyone else, defendant remained undeterred and provided two evaluators with "'cliff notes' on [his] proposal thoughts."  To ensure that his insider manipulation efforts remained concealed, defendant instructed the other evaluators to give back his papers with comments and, as defendant confided to Paradis later, he "actually lowered Ardent's score in one area because [defendant] was mostly higher than everyone else in one spot," while taking care that Ardent would still be one of the bid-winners.  Civetti Decl., Ex. 4.

### C.    Defendant Solicits an Executive Role at Ardent

Approximately one week after Ardent had submitted its proposal, on July 16, 2019, defendant and Paradis met over lunch to discuss the LADWP RFP.  Defendant took the opportunity to remind Paradis of his past and ongoing efforts to influence the other evaluators in scoring Ardent favorably.  Paradis thanked defendant and asked him what his future employment plans were.  It was at that point that defendant proactively solicited employment with Ardent and pitched himself as the right person for the job:

> **Defendant:** Um, the other possibility, believe it or not, Ardent needs a business manager.  They need someone who understands cyber well.  They need, they need—but, it's an internal-facing function.  I'm the one who would do business proposals, I'm the one who would make sure that they're not doing stupid shit internally.

> Paradis:  Look, you've done a lot of RFP-related stuff.  You've done a lot, I saw a lot of value in you.  The day that you spent writing and then re-writing the proposal for us.  Huge value there.

> **Defendant**: Yeah.

Paradis:--Right.  Rather than me talking, I'll listen to you.  You know, I'm happy to hear you talking like this.  Go ahead and give me some more thoughts, ideas, details because—

**Defendant**: --You need someone—all of your people are customer-centric, customer focused at Ardent.  In Ardent.  I should say that they are all staff services to customers. But you've got no internal structure at all.  Collectively. There's no one who sits there and basically provides all of the operational functionality and lead, internally, that organization.  You need somebody like a business manager.  Someone who is going to go out and look for business, make sure your RFPs are square, make sure your bids are square.  Make sure that you got some common sense.  Pull in the resource—like, you pull in the resource for the customer, pull in the resource needed to run internal shit.  And make it operational internally.

Civetti Decl., Ex. 5.  Defendant and Paradis proceeded to have a detailed discussion about Ardent, its future business plans and defendant's role, the platinum-level health insurance benefits, as well as a prospective start date of September 1, 2019.  Defendant agreed to write up a job description of his intended role, along with his expected pay and other terms for the job at Ardent.

Near the conclusion of the meeting, defendant returned to the topic he had discussed at the top: the LADWP RFP.  Defendant assured Paradis that he would "pull [his] weight in making sure [the process] stays in order."  For that reason, defendant stated that he would in fact need to stay at LADWP until October 2019, to give him sufficient time to shepherd the contract through to Ardent from the inside.  Following the lunch, and consistent with his discussion with Paradis, defendant immediately began to work on his desired Ardent job description and texted Paradis to propose "my new job" as Ardent's Chief Administrative Officer ("CAO").

Although law enforcement disrupted defendant's plans before he and Paradis solidified the terms of his future pay, defendant's total LADWP pay and benefits in 2018

was approximately $371,321.[2]  Civetti Decl., Ex. 6.  It would be highly unreasonable for defendant to have expected anything <u>less</u> than his then-current pay as he headed into a C-suite position at a private company raking in tens of millions of dollars from LADWP alone, particularly considering the illicit acts defendant was taking to benefit that company, at great personal risk.

### D. Defendant Guarantees Paradis Millions of Dollars in Task Orders for Additional Compensation

The very next day on July 17, in furtherance of his plan to retire early from LADWP and start his employment at Ardent, defendant met with Human Resources. During that meeting, defendant learned of a potential financial obstacle to his planned LADWP exit and texted Paradis: "[j]ust finished my conversation with the retirement group.  Not good at all.  We need to talk to discuss options, when you have a chance." That same day, defendant met with Paradis and explained that because he was not 55 years old, defendant would lose what amounted to $60,000 a year "for 30 years" or "for the rest of [his] life" in his retirement pension, unless he stayed at LADWP for three more years.  In other words, defendant would lose out on $1.8 million if he left LADWP to join Ardent officially on the timeline that he and Paradis had discussed.

In response, Paradis indicated that he could guarantee defendant the additional money to make up for defendant's $1.8 million retirement penalty but that, in exchange, defendant also would need to "guarantee" task orders for Ardent, on top of pushing the LADWP contract through.  After some discussion, defendant stated that he could realistically guarantee task orders for $1,000,000 on personnel training; $7,500,000 in lab training; and between $2,000,000 and $3,000,000 in governance, risk management, and compliance, or GRC, for a total of at least $10,500,000 in task orders.  Defendant stated that, although he could not guarantee a task order, he could also help push remediation work towards Ardent.  At one point in the discussion, defendant took out a

---

[2] https://transparentcalifornia.com/salaries/2018/los-angeles-department-water-and-power/david-f-alexander/

calculator to add up the amounts he could justify in a GRC task order and pondered out loud how he could "bolster" that sum. Civetti Decl, Ex. 7. Because of the additional time and effort that defendant would need to expend to secure the LADWP task orders—an undertaking he could effectuate only by leveraging his role as the Chief Cyber Risk Officer—defendant and Paradis further agreed to a signing bonus to compensate defendant.

Reflecting defendant's painfully obvious knowledge of the brazen illegality of his double dealings, defendant assured Paradis that "as far as what I do and when I can execute against that contract is between you, me, and the wall" and that he would not even tell his wife because she needed "to be able to attest" should she ever be questioned.

### E.   Defendant Continues His Corrupt Arrangement to Be Ardent's CAO

Following defendant's additional scheme to cash in on his role as a public official by securing task orders, defendant wasted no time in assuming his de facto role as Ardent's Chief Administrative Officer. Defendant began advising Paradis more broadly about Ardent's business plans, including providing specific advice about building collateral for other RFPs and obtaining information about another potential RFP.[3]

Defendant also requested from Paradis tools to aid defendant in his plans to furtively act as an agent of Ardent while still working at LADWP for the purpose of enriching Ardent, and by extension, his future self. Defendant asked for a separate laptop from which he could conduct all his Ardent work "with no evidence anywhere else" and that he could have Paradis dispose "lock, stock, and barrel" if they were ever caught. Defendant also asked for a secret Ardent email address, styled after his middle name and residence.

---

[3] The defense confusingly states that this RFP may have been a fake "prop" to scare defendant. But there is nothing "scary" about the RFP, as defendant volunteers that he will help Ardent "on any other avenues that you're seeking" and authoritatively explains to Paradis, "I need to find out who's driving this [RFP] before I advise you." (Def. Ex. L at 55:14-20.) Defendant later provided information to Paradis on this (real) RFP, concluding that "we don't need to bother" applying. (Def. Ex. P at 9m 59s.)

### F.      Defendant Seeks to Obstruct the Federal Investigation

On July 22, 2019, federal investigators went overt with their criminal investigation when the FBI executed search warrants at LADWP.  To conceal his criminal plans and actions, defendant advised two purported co-conspirators of his efforts to destroy evidence of his email communications with Paradis and the RFP-related documents tying him back to Paradis.

Specifically, on a call with David Wright on July 23, 2019, defendant explained that he had used his personal email account, which is accessed only by a completely independent server with its own Internet domain at his home, to communicate with Paradis about the Ardent proposal.  Civetti Decl., Ex. 8.  Defendant advised Wright that he had already deleted the documents and emails from the personal account.  Id.  When Wright asked whether Paradis had offered defendant anything, such as future employment, defendant lied and told Wright there was no consideration whatsoever.  Id.  Similarly, on a call with Paradis on July 23, 2019, defendant confirmed that the email server was "safe" and that emails from his personal "Taz Meister" account were gone.  Civetti Decl., Ex. 9.

Defendant also began planning his defense.  Following the execution of the search warrants, defendant told Paradis:

> I think I can wiggle my way out of the FBI thing because there was no compensation, there was no consideration so it's not really fraud.  No personal gain whatsoever.  And I can write that off as, "Hey, I'm doing what I think was good for Cyber." Cyber posture.  I mean, there's a possibility to explain that. Not the City, the City can still fire my ass completely even as a civil servant.

Civetti Decl., Ex. 10.  In other words, even before speaking with the FBI, defendant already began making plans to create a false narrative and mislead the government by claiming he received no personal gain and that he actually had LADWP's best interests at heart, based on a claimed belief that Ardent was a suitable vendor to render cybersecurity services.

On July 24, 2019, defendant participated in a voluntary interview with the FBI.  In response to questioning, defendant falsely stated that he had declined any employment opportunity with Ardent and that he had not expected any compensation from Paradis. In support of these lies, defendant pointed to his text message to Paradis that his discussion with retirement was "[n]ot good at all.  We need to talk to discuss options" as proof that defendant had ended all discussion of a potential employment with Ardent:

> Agent:       Where did you leave it off with Paul about the potential job opportunity with Ardent?
> **Defendant**: Oh, not interested.
> Agent:       And when did that conversation--
> **Defendant**: That was a few days ago.
> Agent:       Was it after the searches or before?
> **Defendant**: Oh, well before the searches.
> Agent:       Okay, and so—
> **Defendant**: --it was last Thursday, I think.  I mean, I actually have this thing where I'm saying, hey we need to talk.  And that's the date that it was… [Pause.] [OV] So "dude, just had my conversation with retirement," so Thursday.
> Agent:       That was Thursday?
> **Defendant**: Wednesday, sorry Wednesday July 17.
> Agent:       Okay.  And that's when, then, do you meet with him—
> **Defendant**: --We walked over to the Starbucks over at the park and sat down on a bench.  And talked over there.   Not going to happen, no, there's no way, it's done, sorry, have a nice, you know, basically, have a nice day, yeah, it's not going to work.  It's not going to work.  And that was it."

Civetti Decl, Ex. 11.  In reality, that text message precipitated defendant's criminal arrangement with Paradis to guarantee over $10,000,000 in task orders for Ardent in exchange for recompense for the retirement penalty and a sign-on bonus.

On July 26, 2019, defendant participated in a second voluntary interview with the FBI.  Defendant again falsely and vehemently claimed that he had declined any employment opportunity with Ardent and that he had never provided any guarantees to Ardent or to Paradis:

Agent:  What about yourself?  Any guarantees to Ardent –
**Defendant**: Absolutely not.
Agent:   -- or Paul?
**Defendant**: To nobody.  I had no control over it.
…
Agent:  Anything brought up about the benefits?
**Defendant**: No, we had not even talked about it. I actually had the more benefit discussion with my wife that night. I was like okay I got to make sure I, and I am thinking about that. But again number one step was whether or not the retirement would be affected. The moment I found out the retirement would be affected I said oh, excuse the language, oh fuck all this I am not touching my retirement.  That--
Agent:  Did he offer to pay part of her retirement?  Or anything to get you on board now?
**Defendant**: I just told him, I said, dude it's not going to happen.
Agent:  It was just a flat out no?
**Defendant**: No.  Not going to happen.

Civetti Decl., Exs. 12-13.

## III. PROCEDURAL HISTORY

On December 13, 2021, the government filed an information charging defendant with a single count of making a false statement in violation of 18 U.S.C. § 1001(a)(2), based on the July 24, 2019 interview, along with a plea agreement between defendant and the government.  (Dkt. Nos. 1, 6.)  The detailed factual basis describes not just defendant's acts that constitute the single section 1001 violation, but also his criminal conduct in violation of 18 U.S.C. § 666 (federal program bribery) and another violation of 18 U.S.C. § 1001(a)(2) (false statements).  The total statutory maximum sentence for one section 666 count and two section 1001 counts is 20 years.  However, in exchange for defendant's early acceptance of responsibility pre-indictment, defendant's plea agreement permitted him to resolve his case with a plea to a single § 1001 count, limiting his total exposure to five years.

On February 8, 2022, in accordance with his plea agreement, defendant entered a plea of guilty to one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2).  (Dkt. No. 22.)

## IV.   THE GUIDELINES RANGE

On May 3, 2022, the United States Probation Office ("USPO") issued the presentence investigation report ("PSR"), along with a disclosed recommendation letter. (Dkt. Nos. 24, 25.)  Although defendant pled guilty to making a false statement, the higher guidelines under U.S.S.G. § 2C1.1 for federal program bribery apply, pursuant to USSG §§ 1B1.2(a), 1B1.3(a), and the parties' stipulation.  (PSR ¶¶ 53-57.)  The PSR found that the following sentencing guidelines factors were applicable:

| | | |
|---|---|---|
| Base Offense Level: | 14 | [U.S.S.G. § 2C1.1(a)(1)] |
| Value of bribe between $250.001-$550.000 | +12 | [U.S.S.G. § 2B1.1(b)(1)(G)] |
| Involved public official in high-level decision-making and sensitive position | +4 | [U.S.S.G. § 2C1.1(b)(3)] |
| Acceptance of responsibility | - 3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level | **27** | |

(Id. ¶¶ 58-77.)  The PSR indicated that defendant had no criminal history points, yielding a score of zero and a criminal history category of I.  (Id. ¶¶ 83-84.)  Based on the foregoing, USPO calculated defendant's resulting advisory sentencing guidelines range as **70-87 months**.  (Id. ¶ 153.)  However, due to the five-year statutory maximum, which is lower than the low end of the applicable range, USPO concluded the guideline term of imprisonment is 60 months.  (Id.)

The USPO's disclosed letter recommended a 48-month term of imprisonment. (Dkt. No. 24 at 1.)  The letter briefly summarized defendant's criminal conduct, describing the matter as "serious because Alexander exploited his position as a senior

executive at LADWRP for his own benefit" and because defendant "gave Ardent an unfair advantage over other qualified cyber security companies that did not participate in bribery practices to secure contracts with LADWP." (Id. at 4.)  In mitigation, USPO described defendant's "abusive childhood during his formative years" and his resultant "people pleaser" mentality, along with his educational and employment history.  (Id. at 6.)  USPO reached its recommended 48-month term of imprisonment based on what would effectively be a four-level variance from the guideline range of 70 to 87 months. (Id. at 7.)

The government concurs with the PSR's calculation of the guidelines, which already exceeds the statutory maximum.[4]  However, as explained below, the government

---

[4] The government previously sought to apply the obstruction of justice enhancement under U.S.S.G. § 3C1.1, which applies for "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so." U.S.S.G. § 3C1.1, comment n.4(D).  "Material" evidence is defined as evidence "that, if believed, would tend to influence or affect the issue under determination." Id., comment n.6.

After learning that the FBI had executed search warrants at LADWP, defendant admitted to both Wright and Paradis that he deleted from his personal server incriminating emails and documents about the cybersecurity contract bid-rigging.  The USPO declined to apply the enhancement, reasoning that defendant's destruction of evidence was not "material" to the investigation because his email messages "are still maintained by his cellphone provider and can be accessed," such that "[t]he fact that he erased them does not mean they are gone forever." (PSR ¶ 72.)  The PSR also noted that other coparticipants and witnesses could provide information about defendant's unlawful conduct.  (Id.)  The government respectfully disagrees with the USPO's analysis.  On the contrary, such conduct appears to fall squarely within the described example of the comment: destroying evidence of defendant's corrupt relationship with an LADWP contractor upon learning that an official investigation into Paradis and bribery schemes had commenced.  There is no requirement in the definition of "material" that the destroyed evidence must have been the only available evidence of the conduct or even that it actually influenced or affected the issue under determination.  Rather, the definition of "material" simply requires that the evidence or information tend to influence or affect the issue under determination.  Otherwise, it would be virtually impossible for this enhancement to ever apply, as anytime there is independent evidence

*(footnote cont'd on next page)*

recommends a 51-month sentence, which reflects a low-end recommendation after a three-level variance from the 70- to 87-month guideline range.

## V. THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A. The Nature and Circumstances of Defendant's Offenses

Defendant committed multiple federal crimes, including at least one violation of 18 U.S.C. § 666 for federal program bribery and two violations of 18 U.S.C. § 1001(a)(2) for false statements.  Defendant's offense conduct was proactive, continuous, and aggravating.

Defendant repeatedly exploited his position as a senior leader of LADWP, betraying the trust of the utility and the public and violating the requirements of fair competition for his own personal advancement and wealth.  This is not a case where defendant made a misstep in a moment of weakness or got caught up in a one-off deal when presented with the opportunity.  Defendant was an eager, willful, and calculated schemer who manipulated not just one, but two significant bid processes for public contracts worth millions of dollars.  Defendant committed to his corrupt plans, down to the smallest details, which included engaging in extensive communications with Paradis about the contracts that for the better part of four months.  He proactively reviewed Ardent's proposal, spending significant time re-writing the document, making line edits, repeatedly asking to review the final draft, and even checking in to make sure Paradis had assembled the paper copies properly.  Civetti Decl., Ex. 14.  Then, defendant stacked the deck by influencing the other scorers in direct contravention of the nondisclosure agreement, with the goal of securing Ardent the cybersecurity contracts and, simultaneously, his financial future.

---

proving the destruction of evidence would necessarily disqualify the application of the enhancement.  Such a reading would paradoxically advantage defendants whose obstructive efforts fall short for reasons outside their control.

In any event, upon further review, forensic evidence from defendant's recovered server was inconclusive as to whether defendant actually destroyed or attempted to destroy the referenced emails and documents. Given that ambiguity, the government withdraws its recommendation to apply the enhancement.

Perhaps most troublingly, defendant's criminal conduct escalated over time. Even apparent obstacles, like a seven-figure early retirement penalty for leaving LADWP early, became opportunities for defendant to cash in further on his position as the Chief Cyber Risk Officer. Defendant sought to leverage his position and influence to procure over $10,000,000 in task orders for Ardent and pledged to steer additional remediation task orders to the company that he fully expected to become the Chief Administrative Officer of in short order. Indeed, defendant adjusted his plans to stay at LADWP even longer than he would have liked so that he could continue to use his job as a public servant for Ardent's benefit. Defendant was nothing short of enthusiastic when it came to acting as Ardent's CAO to-be. Without prompting, defendant began doling out advice and business direction to Paradis and sought additional tools by way of an Ardent laptop and email to continue his work. All the while, defendant knew full well the illegal and corrupt nature of his arrangement, including the need to conceal his plans from his wife and to dump the evidence "lock, stock, and barrel" if he were ever at risk of being caught.

When that time finally did come and defendant was caught, he did not exhibit remorse for what he had done. Rather, he doubled down and acted out of self-preservation, advising his purported co-conspirators that he had covered his tracks, planning his defense, and lying to the FBI that he had shot down the Ardent job and never provided any kind of guarantee to Ardent or Paradis. Had it not been for the government's disruption, the evidence demonstrates that defendant would have continued to capitalize on his LADWP position for the benefit of his future employer, Ardent.

Consistent with his articulated plan to Paradis to "wiggle [his] way out of the FBI thing" (see Civetti Decl., Ex. 10), defendant now leans heavily into the defense that he acted for the good of LADWP and was simply going along with what LADWP leadership wanted. As a preliminary matter, a cooperator's editorializing interpretation of a conversation—of which defendant was <u>not</u> a part—has no bearing on defendant's

state of mind or the underlying facts at issue.  More importantly, the defense points to nothing to suggest that anyone at LADWP—including David Wright—knew of, much less endorsed, defendant's efforts to parlay his bid-rigging on Ardent's behalf to obtain a personal benefit for himself.  To the contrary, defendant knew full well the illegality of his actions and therefore concealed them, including by lying to Wright when asked if Paradis had ever offered defendant any employment or consideration.  Id., Ex. 8.

These facts are highly aggravating, such that the nature and circumstances of defendant's multiple offenses weigh strongly in favor of the government's recommended 51-month sentence.

## B.    Victim Impact

Defendant's actions harmed the public confidence in government and, more specifically, they harmed LADWP, its ratepayers, and the dozens of competitor vendors who were denied a fair shot at obtaining a cybersecurity contract with the largest public utility in the United States.

As the current Board President of LADWP noted in her public remarks, the criminal actions of defendant and others caused "extraordinary damage" and inflicted an "incredible breach of trust . . . on this Department":

> There is, and there are, no words to describe the level of outrage, sadness, and sense of betrayal felt by this Board and by the members of this Department, or the regret that we feel associated with *the extraordinary impacts of [defendant's] behavior, negative impacts, both as it relates to Department operations, but again, and more significantly, as it relates to the level of service that we provide to our customers*. . . .  I have full appreciation for the extraordinary pain associated with many of the employees, and particularly of many of the members of our senior management team, who worked closely, unbeknownst to them, with a now admitted person of ill repute who was in real time seeking to defraud the Department and committing crimes upon the Department. . . .  I regret what has occurred, apologize to members of the public who are reading with dismay the events that have transpired at this Department, and want to also stand with the thousands of employees who come to work every day and give every measure their best at all times.

Civetti Declaration, Exhibit 15.  The current Board Vice President also commented, explaining as follows:

The actions of [defendant] have brought shame and disgrace. It has stained the trust that we have built over the years with our customers, our allies, our partners, and employees. It has disrupted our values and norms. And more importantly, it has impacted and disrupted our hardworking and dedicated employees. And I really want to focus on that today. Employee morale is hurting. At a time when the leaders of this organization are working to change our culture to embody more trust, transparency, inclusion, and accountability, this crisis comes before us. ***Corruption hurts everyone***. ***Employees that know that they are working for an unethical organization where bribery is tolerated and practiced are more likely to be unmotivated and disinterested in their work***. And this negatively impacts performance, output, and overall staff morale. And this can lead to poor performance and high turnover. And when corruption and bribery takes place, resources are diverted from their appropriate and planned-for destination. ***Corruption reduces that infrastructure of our organization as well as the effectiveness of public investments***. . . .

Id.

This Court can take a step toward remediation of this broad and immeasurable damage with a strong custodial sentence.

## C.   General and Specific Deterrence

The strong need for both general and specific deterrence in this case also support the government's recommended sentence. Public corruption cases such as this one demand strong general deterrence. As one court noted:

> ***Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable***. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. ***It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all*** — not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added). General deterrence is a particularly effective tool in corruption and other white-collar cases, as white-collar criminals often premeditate their crimes and engage in a cost-benefit analysis. See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes

17

1    are prime candidates for general deterrence.  Defendants in white collar crimes often

2    calculate the financial gain and risk of loss, and white collar crime therefore can be

3    affected and reduced with serious punishment.").

4         A guidelines sentence (or near-guidelines sentence) is appropriate here and will

5    aid in achieving the critical need for general deterrence, while also rejecting the notion of

6    a two-tier system of justice—a more flexible and lenient tier for well-known or well-

7    heeled white-collar defendants, and a more rigid, severe, and guidelines-oriented tier for

8    "other" criminals.  See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014)

9    ("[O]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer

10   penalties for white-collar crimes and to eliminate disparities between white-collar

11   sentences and sentences for other crimes." (citation omitted)).  That dichotomy is

12   inconsistent with the Constitution, with fundamental fairness, and with the statutory

13   goals of sentencing, and it has been repeatedly repudiated by the courts.  See United

14   States v. Treadwell, 593 F.3d 990, 1012–13 (9th Cir. 2010) (overruled on other grounds)

15   (rejecting the principle that a defendant of means should be afforded a lower prison

16   sentence to enable him to pay restitution to his fraud victims, and noting the critical

17   importance of "the minimization of discrepancies between white- and blue-collar

18   offenses, and limits on the ability of those with money or earning potential to buy their

19   way out of jail" (quoting United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006)));

20   United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (White-collar criminals

21   are "not to be treated more leniently than members of the 'criminal class'").  A

22   meaningful sentence in this closely watched case will thus serve an important public

23   purpose.

24        This case also reflects a strong need for specific deterrence.  Defendant sought to

25   obstruct justice, reassuring his purported co-conspirators that he had destroyed evidence

26   and repeatedly and brazenly lying to the FBI.  A strong custodial sentence is needed to

27   deter defendant from future attempts to obstruct or mislead law enforcement, with whom

28

defendant will likely continue to interact so long as he works in the regulated space of cybersecurity.

### D. Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

A strong sentence is necessary to reflect the serious nature of defendant's crimes, punish defendant's conduct, promote respect for the law, and restore public faith in the system. As one court has observed: "The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself." United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015). Here, the appropriate judicial response to defendant's brazen and self-serving bribery conduct, as well as his multiple attempts to obstruct justice, is a substantial custodial sentence.

### E. History and Characteristics of Defendant

Defendant's history and characteristics present both aggravating and mitigating circumstances.

According to the PSR, defendant had a difficult family upbringing, including bouts of abuse by his "survivalist" father. The government does not dispute the challenging conditions of defendant's childhood. And defendant deserves credit for extricating himself from a less-than-ideal family situation more than three decades ago and seemingly living as a productive member of society. What the government does dispute is the argument that Paradis somehow scared, manipulated, or "entrapped" defendant by discussing the cyber vulnerabilities at LADWP with him. As even a cursory review of the transcripts makes clear, the discussions between Paradis and defendant were far from the one-sided "scare mode" that the defense makes them out to be. To the contrary, these robust conversations are mutually conspiratorial, with defendant often raising the issue and confiding in Paradis, including his speculation that LADWP could be liable for millions of dollars in fines to regulators. (See Def. Ex. J [April 5, 2019 Transcript] at 4:1-6:42.) The recordings reveal that defendant had been

concerned about his own personal liability as it related to cybersecurity issues at LADWP—some of which developed and continued under defendant's watch as the Chief Information Security Officer and then as the Chief Cyber Risk Officer—long before Paradis.[5]

Notwithstanding some of his earlier struggles, defendant went on to enjoy a number of advantages, particularly in the way of educational and employment opportunities.  After moving out of the house when he was 17 years old, defendant obtained both a B.S. and a Master's degree.  (PSR ¶¶ 112, 132.)  Defendant has maintained steady employment since 1984, and he worked at LADWP from 2003 to 2019, steadily rising through the ranks of the department.  (Id. ¶¶ 137-145.)  Defendant has been married to his current partner for approximately 17 years, following his first marriage of about 13 years.  (Id. ¶¶ 119-20.)  Defendant maintains regular contact with his sister, and the USPO reports that numerous friends, family, and colleagues have written in support of defendant.  (Id. ¶¶ 113, 124.)

Defendant's educational and employment history and seemingly supportive marriage and community may arguably reflect positively on defendant's ability to rehabilitate and live a law-abiding life as a gainfully employed member of society.  At the same time, the fact that defendant enjoyed some of these advantages while abusing the public trust—and even using some of them to effectuate his criminal acts—is also aggravating.  It is not as if defendant did not comprehend the illegality of his acts—he knew better.  Defendant did not act out of financial or social desperation—at the time of his criminal acts, more than ever before in his life, he had options and a safety net, including substantial financial assets, an income-earning partner, and a supportive sister and friends.

---

[5] This aspect of the defense's narrative is also inconsistent with defendant's claimed belief that he saw Paradis as a "close friend" (a feeling that does appear to be reflected in some of the recordings).  (See Def. Ex. C [Defendant's Letter].)

20

At a minimum, defendant's sentence should not improperly favor certain classes based on socioeconomic status, education, or vocational skills.  See 28 U.S.C. § 994(d) (requiring sentencing guidelines to be "entirely neutral as to ... socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"); 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"); 5H1.10 (socio-economic status is "not relevant in the determination of a sentence"); see also United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) (explaining that collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.  And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose'").  On balance, the government submits that its recommendation of 51 months' imprisonment appropriately accounts for defendant's history and characteristics.

### F.    Avoidance of Sentencing Disparities

The Court is also to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).  Helpfully in this case, there is a similarly situated defendant who has already been sentenced by this Court: David Wright.  Wright, the former General Manager of LADWP, was sentenced to 72 months for his own bribery scheme and corrupt relationship with Paradis.  See United States v. David H. Wright, Case No. 2:21-CR-00559-SB, Dkt. No. 46 (Judgment and Commitment).  Wright held the highest position within LADWP, and his criminal conduct was more involved, due in part to the extended temporal scope of his corrupt relationship with Paradis, which spanned nearly

21

two and a half years.  Wright pled guilty to federal program bribery, which capped his sentence to 10 years' imprisonment.

Defendant, while in a managerial role, reported up to the Chief Administrative Officer, who reported to the General Manager.  Although defendant's criminal arrangement with Paradis was not as protracted as Wright's, his conduct was still sustained (lasting from early 2019 to late July 2019), serious, and proactive.  Before the investigation became overt, defendant demonstrated the same corrupt commitment to Ardent and Paradis as Wright had—exploiting his job as a public official to secretly manipulate two bidding processes and to commit to securing task orders, all in exchange for an executive-level salary and position and additional compensation.  Like Wright, defendant also sought to conceal his criminal acts from law enforcement by lying to the FBI.  Unlike Wright's exceptional acceptance of responsibility and efforts at cooperation, defendant's acceptance of responsibility entitles him to the three-level reduction pursuant to U.S.S.G. § 3E1.1, but certainly no more.  Indeed, even now, defendant continues to shift blame, stating that his "trust [in Paradis] was both seriously misplaced and sorely violated."  (Def. Ex. C [Defendant's Letter] at 2.)  The issue is not a violation of defendant's trust in Paradis: the issue is about defendant's violation of the public trust to LADWP and its ratepayers.  Defendant has pled to one false statement, which has a 60-month statutory maximum.

Taking into account the factors that the Court must consider under 18 U.S.C. § 3553(a), including the need to avoid unwarranted sentencing disparities among similarly situated defendants, a 51-month sentence is sufficient, but not greater than necessary, to address defendant's criminal conduct.  It is serious custodial sentence that takes into account the aggravating factors of this case, but it also reflects an appropriate degree of leniency, based on an effectively three-level variance and sentence at the low-end of the resulting range.

### G.    Fine

The PSR calculated defendant's fine range at $25,000-$250,000 and found that defendant had significant assets and a net worth of approximately $2.3 million.  (PSR ¶¶ 149, 161.)  Among his other substantial assets and income, defendant has been receiving, and will continue to receive, $8,176.82 per month in his taxpayer-funded pension from LADWP—the same retirement payment that he sought to bolster by an additional $60,000 per year through a corrupt arrangement with Paradis.  (See id. ¶ 146.) The PSR did not identify any dependents, although it noted that defendant and his sister pay for additional expenses for defendant's brother not covered by his disability benefits. (Id. ¶ 91.)

The government recommends a fine of $70,000, in light of the nature and scope of the offense conduct, the financial nature of defendant's crimes, his motivation of greed, and the USPO's supported finding that defendant had a net worth of over $2 million.[6]

## VI.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) 51 months' imprisonment; (2) a three-year term of supervised release; (3) a $70,000 fine; and (4) a special assessment of $100.

---

[6] The USPO recommended a low-end fine of $25,000, which the government believes to be inadequate punishment, particularly in light of defendant's healthy financial situation, the multi-million-dollar value of the benefit that defendant sought to bestow onto Ardent/Paradis, and the arguably seven-figure-dollar value of the bribe that defendant agreed to accept and expected to receive.  (See Dkt. No. 24 at 1.)